697 So.2d 5 (1997)
Clifton R. MOORE
v.
POPEYE'S FRIED CHICKEN and RISCORP.
No. 96 CA 1889.
Court of Appeal of Louisiana, First Circuit.
June 20, 1997.
*6 David P. Sirera, Covington, for Defendants-Appellants.
Cassandra Krebs Beasley, Covington, for Plaintiff-Appellee.
Before SHORTESS, FOGG and PARRO, JJ.
SHORTESS, Judge.
Clifton R. Moore (plaintiff) filed a claim for workers' compensation benefits against his former employer, Pontchartrain Foods, Inc., d/b/a Popeyes Fried Chicken[1] (defendant), alleging he sustained a shoulder injury on September 4, 1995, while in the course and scope of his employment.[2] After a hearing, the workers' compensation hearing officer rendered a decision in favor of plaintiff, awarding him temporary total benefits from September 4, 1995, through November 9, 1995, penalties of $2,000.00, and attorney fees of $5,000.00. Defendant appealed.[3] Plaintiff then answered the appeal seeking additional attorney fees.

FACTUAL BACKGROUND
On September 4, 1995, plaintiff was working as a seasoner trainee at a Popeyes restaurant in Covington. Plaintiff, who was 44 at the time of his injury, testified he is a Vietnam-era veteran who suffered brain damage in a military-service-related accident. He draws a military-disability pension and is followed by a caseworker. Although he obtained a GED and had two years of nursing training in the service, he testified he can no longer read or write well because of his injury.
Plaintiff attends church two to three times a week and relies on his church for assistance. Bryan L. Bilac, the assistant pastor at plaintiff's church, testified he was well acquainted with plaintiff before the accident. Plaintiff's usual mode of transportation is by bicycle, but before he bought the bike, Bilac frequently gave him rides. Church members filled out job applications for plaintiff, including his application to work for defendant. Plaintiff had been working for defendant only two weeks before his injury.

Plaintiff's version of the accident
Plaintiff testified, and his time card shows, he came to work at 4:00 p.m. on September 4, 1995. He rode his bicycle to work and parked it behind the restaurant. After he had worked about two hours, he went to the freezer to get a crate of chickens. The crates, which were full of chickens and ice, were stacked one atop the other. The top crate was completely over his head. He stepped on one of the bars of a rack to reach the crate, grabbed it, and pulled it down. He felt "a kind of a draft through" his left shoulder, "[l]ike a nerve pain coming out." He continued to work and told no one about the injury. He stated he did not normally talk to the other employees but just did his work. This was corroborated by J. Brad Gallo, a co-employee, who testified plaintiff was not a talkative person.
About thirty minutes later, his boss told him there was no more work for him to do that evening. His time card shows he clocked out at 6:42 p.m. He left the restaurant, got his bike, went to the Delchamps store across the street from Popeyes, and then went straight home.
*7 Plaintiff noticed a swollen lump on his shoulder when he got home. He called his caseworker, who told him to go back to Popeyes, report the accident, and have them send him to a doctor. Instead, he decided to wait until the next day. When he awoke, his shoulder was sore. He rode his bicycle to Popeyes, arriving about 8:00 a.m. A different manager was on duty than had been the night before. He told the manager he hurt himself while at work the previous evening. She told him to go to the doctor and defendant would "take care of that."
Plaintiff called Dr. Tania A. Levi, who told him to go to the emergency room. He bicycled to the emergency room of St. Tammany Parish Hospital, where he was x-rayed and his arm placed in a sling. He was given a prescription for pain medication. He bicycled to a pharmacy to have the prescription filled. Someone from the pharmacy called defendant for authorization to fill the prescription as a workers' compensation claim, but defendant refused to give authorization. Plaintiff was then forced to call Bilac, his pastor, for financial aid in buying the medication. Bilac drove to the pharmacy, paid for the prescription with church funds, and then drove plaintiff to Popeyes to deliver a note from the doctor stating plaintiff could not work. Plaintiff was treated by Levi and by an orthopedist, Dr. Paul M. Doty, until he was released to return to full-duty work on November 9, 1995.

Defendant's actions following the accident
Defendant stipulated to the term of plaintiff's disability but denies he was injured while on the job. Angie C. Leggitt, defendant's administrative assistant who routinely handles workers' compensation claims, testified she began receiving calls for authorization of plaintiff's medical treatment on September 5. She told the first caller she had no knowledge of the claim and denied authorization. Later that afternoon, Levi's nurse called her. She asked the nurse how plaintiff claimed to be injured. The nurse then read the doctor's statement to her which indicated plaintiff had an on-the-job injury. Leggitt stated she denied the claim because plaintiff "never officially came in and said" he hurt himself on the job.
Leggitt testified that during the first three days following plaintiff's injury she got a "barrage of phone calls" from plaintiff's doctors, pharmacies, pastor, and caseworker, and from plaintiff himself. She did not try to contact plaintiff, but she spoke to him when he called wanting to know why she had denied his claim. She told him defendant's employee handbook required him to report an injury immediately. He replied that he could not read the handbook. She testified she looked at his employment application and saw that he had served in the military. She stated that to her "that meant he could read."
Although she testified she does not normally investigate claims before deciding whether to deny them, Leggitt talked to Ruby Walsh, the manager on duty the night of plaintiff's injury, Wanda Williams, the manager on duty the next morning, and Bessie L. Williams, who was working the night of plaintiff's injury. She did not look at time records or question the employees who were working that night or speak to any other employees who were working during plaintiff's shift. Based on her conversations with those three women, she completed the accident report. Her report gives the following description of the accident:
Claims to have hurt himself while lifting 30 lb. cases of chicken and restacking. He continued to work remaining shiftincluding moving 2, 36 lb. cases of milk for another employee. He finished his shift got on his bicycle and left for the day. He never said anything to anyone with reference to having hurt himself. He did not show any signs of having problems lifting other items.
He came to the store the next morning to tell the manager on duty that he was going for medical treatment. He did not inform the mgr. how he hurt himself. We believe he might have fallen from his bicycle on his way home.
Leggitt stated she got the information that plaintiff finished his shift from Walsh. Walsh testified plaintiff probably came to work at 4:00 p.m. His shift was normally over between 6:00 p.m. and 8:00 p.m. She thought his shift ended at 8:00 p.m. on the *8 day of his injury, although he could have gotten off earlier. She recalled that it was getting dark when plaintiff left.
Leggitt testified she got the information plaintiff had moved two cases of milk from Bessie Williams. Leggitt thought his claim seemed "a little bit questionable" because he was able to move the milk, although she admitted she did not know what the cases of milk looked like or how much they weighed. Bessie Williams testified, however, that plaintiff was leaving as she arrived, that she saw him slide aside the tops to chicken crates, which were not very heavy, to get to his bike, but that she did not see plaintiff move any milk that day.
Leggitt said the information that plaintiff did not officially report he had been injured on the job when he came to Popeyes the day after his injury came from Wanda Williams. Williams did not testify.
When questioned about the source of her theory in the report that plaintiff had fallen from his bike, Leggitt admitted she had no basis for it at the time she completed the report:
Q.... You write this on the report "we believe", or you believe, he may have fallen off his bike. What made you believe that?
A. I don't know. Maybe because he didn't report it to anyone when it happened.
Q. All right. Were there witnesses? Did someone tell you he fell off his bike at that time? This is four days after the accident.
A. When this was written, no.
Q. No one told you. Did you
A. Not when this was written.
Q. hear rumors. Did you hear anything? Did you find outI need to know if there are any documents or witnesses at that time?
A. At this time when this report was written, no. The only thing we had to go on was the fact that we knew that he had continued his shift and had continued to lift heavy items
Q. So at that time
A. not showing any signs of pain or discomfort or anything.
Q. Okay. So when you wrote that, there were no witnesses, it was just a theory at that time?
A. At that time.
Q. Okay. Whose theory was it, yours or someone else's? DidI mean, did you have help in preparing this, or this just comes from you?
A. Comes from me.
Leggitt stated one of her reasons for denying the claim was because plaintiff continued to work after his injury. She had never obtained any doctor's reports, but it was her understanding plaintiff had suffered a dislocated shoulder. She had heard a dislocated shoulder causes excruciating pain, and it seemed strange to her that plaintiff claimed not to have been in immediate acute pain.
The emergency room diagnosis was left acromioclavicular tear. Levi referred to plaintiff's injury as a separated shoulder. Doty's diagnosis was shoulder strain, which he stated meant the same as shoulder separation. Doty testified this injury would cause immediate pain but stated plaintiff reported to him he felt pain at the time of his injury. He explained this type of injury was caused by stretching the ligaments and was consistent with either a pulling motion with the arm or a fall on the shoulder. He stated he had no reason to believe the injury came from anything other than a pulling motion.

Defendant's defense at trial
Approximately two weeks before trial, defendant discovered two witnesses to support Leggitt's theory that plaintiff had fallen from his bicycle on his way home. Peggy M. Herrin and J. Brad Gallo, two of defendant's employees, testified they were sitting in front of Popeyes about 3:30 p.m., waiting to begin their 4:00 p.m. shifts, when they saw plaintiff leave. They stated he came from the back of the restaurant with his bicycle and walked his bike across the highway. He then got on the bike and began pedaling toward a Wendy's restaurant. He hit a curb at Wendy's and fell from the bike.
According to Herrin's written statement dated April 30, 1996, plaintiff told her and Gallo that he had hurt his arm and shoulder. At trial she testified she had not spoken to *9 plaintiff since he left the store. Gallo testified he and Herrin watched plaintiff after his fall "to see if he was okay." When plaintiff got up, he and Herrin went into the store. He stated he had no idea plaintiff was injured.
Plaintiff introduced Gallo's, Herrin's, and plaintiff's time records from the day of plaintiff's injury. Those records show all three of them began work at 4:00 p.m. Gallo worked straight through until almost 11:00 p.m. Herrin worked until 10:30 p.m., taking a twenty-five-minute break beginning at 7:47 p.m. Plaintiff clocked out at 6:42 p.m. Thus, both Gallo and Herrin were "on the clock" at the time plaintiff left and, according to the time records, could not have seen plaintiff fall from his bike as they described.

DEFENDANT'S CONTENTIONS
Defendant contends plaintiff was not a credible witness and thus the trial court erred in finding plaintiff proved his case by a preponderance of the evidence. Defendant alleges three bases for its claim of plaintiff's incredibility: (1) plaintiff made a "ridiculous assertion" that he felt no pain when he was injured; (2) plaintiff gave Leggitt "evasive and inconsistent answers" when questioned why he did not report the injury immediately; and (3) Levi's medical records state plaintiff fell at Popeyes.
Plaintiff did not testify he felt "no pain" when he was injured. Instead, he described feeling "[l]ike a nerve pain" in his shoulder. Nothing in the record indicates plaintiff should have suffered excruciating, immediately-disabling pain.
Plaintiff explained he did not immediately report the injury because he did not realize its seriousness at the time. Leggitt stated plaintiff initially told her he did report the injury immediately, but he then recanted. Plaintiff testified he told only his caseworker about the injury that night. Our supreme court has noted in at least two cases that a short delay in reporting an injury is more corroborative of the plaintiff's initial unawareness of the seriousness of the injury than any cause to doubt the plaintiff's credibility.[4]
Although Levi's brief handwritten notes of September 7, 1995, state "fell at Popeyes," plaintiff denied he gave that history to Levi. Levi did not testify. We note that both the doctor's and nurse's notes from the St. Tammany Parish Hospital emergency room, written the morning after the injury, are consistent with plaintiff's testimony. The nurse's notes state: "[L]ast night he was working at Popeyes and reached up to get a crate of chicken and feels he pulled something in (L) shoulder." The doctor's notes state plaintiff complained of "shoulder pain after lifting a box overhead last p [.]m." The history in Doty's notes is also consistent with plaintiff's version of the accident.

LAW AND APPLICATION TO FACTS

Work-related accident
Despite the liberal construction of law in workers' compensation cases, the plaintiff's burden of proof is not relaxed. The plaintiff has the burden of establishing a work-related accident by a preponderance of the evidence.[5] A worker's testimony alone may be sufficient to discharge this burden if (1) no other evidence discredits or casts serious doubt upon the worker's version of the incident; and (2) the worker's testimony is corroborated by the circumstances following the alleged incident.[6] Corroboration may be provided by medical evidence or the testimony of fellow workers or friends.[7]
The hearing officer's determinations whether plaintiff's testimony is credible and whether plaintiff has discharged his burden of proof are factual determinations which *10 will not be disturbed on review in the absence of manifest error.[8] In this case, the hearing officer found plaintiff's version of the accident credible:
Claimant's testimony, and events following the incidentcalling his caseworker, reporting the injury the following morning, going to the emergency room, and delivering a copy of the emergency room report to the employersufficiently prove that claimant sustained an on the job injury while retrieving a 30 pound box of chicken from the freezer on September 4, 1995. The defendant's evidence of claimant falling from his bicycle and lifting two 36 pound cases of milk falls short of discrediting or casting any doubt on claimant's testimony.
We find no manifest error in this factual finding. Plaintiff's version of the accident was reasonable and was corroborated by the medical evidence. Defendant's witnesses, Gallo and Herrin, were impeached by their time records. The hearing officer's finding that plaintiff's version was more credible than defendant's was a permissible view of the evidence which cannot be clearly wrong.[9]

Penalties and attorney fees
An employer or insurer who denies workers' compensation benefits is subject to penalties and attorney fees.[10] Those penalties and fees may not be assessed if the claim is reasonably controverted.[11] The test of whether the employee's claim has been reasonably controverted turns on whether the employer had sufficient factual and medical information to reasonably counter the factual and medical information presented by the claimant.[12] If the employer fails to investigate the employee's claim, it subjects itself to penalties and attorney fees.[13]
In this case, Leggitt, defendant's employee charged with administering workers' compensation claims, admitted she normally makes no investigation before denying claims. She never requested a medical report from any of plaintiff's treating physicians. She denied his claim on incomplete and inaccurate information that he felt no pain the night of the accident, that he completed his shift, and that he lifted heavy cases of milk after his injury, and on the incorrect legal assumption that she could deny a claim if it was not reported immediately.[14]
Although defendant managed to find two witnesses to support its theory plaintiff fell from his bicycle on his way home, those witnesses were not discovered until two weeks before trial, even though they were working for defendant on the night of the accident and continued to work for defendant through the date of trial. Thus for eight months, despite knowledge plaintiff was injured, defendant denied his claim based on a "theory" that plaintiff must have fallen from his bike, a theory admittedly conjured up by Leggitt with no factual basis at the time. Defendant clearly did not have sufficient factual and medical information to reasonably counter the factual and medical information presented by plaintiff, and we find no error in the hearing officer's award of penalties and attorney fees.

*11 Additional attorney fees

Plaintiff answered the appeal and seeks additional attorney fees for defending this appeal. We find an award of additional fees appropriate in this case. Plaintiff's counsel filed an eleven-page brief which clearly set forth the applicable law. The case was not orally argued. We award additional attorney fees of $1,000.00 for counsel's appellate efforts.

CONCLUSION
For the foregoing reasons, the judgment of the hearing officer is amended to include an award of $1,000.00 for attorney fees for defending this appeal. In all other respects the judgment is affirmed. Defendant is cast for all appeal costs.
AMENDED, AND AS AMENDED, AFFIRMED.
NOTES
[1] Plaintiff sued "Popeye's Fried Chicken." Corporate documents in the record indicate the proper name of defendant is "Pontchartrain Foods, Inc., d/b/a Popeyes Fried Chicken."
[2] Plaintiff named RISCORP as defendant's insurer. Defendant stated in its answer that it was self-insured through RISCORP. The Employer's Report of Occupational Injury or Disease lists the Louisiana Restaurant Association Self Insurer's Fund (LRASIF) as defendant's insurer. RISCORP and the LRASIF appear to be related; correspondence from plaintiff's counsel addressed to an adjuster at the LRASIF was answered on RISCORP stationery, and they have the same mailing address.
[3] The original motion and order for appeal was filed on behalf of defendant and the LRASIF. An amended motion and order for appeal was later filed which added RISCORP. LRASIF was not a party to this suit. RISCORP, although initially named as defendant's insurer, was not named in the judgment, and plaintiff introduced no evidence that either RISCORP or LRASIF provided insurance coverage.
[4] Bruno v. Harbert Int'l, 593 So.2d 357, 363 (La.1992); West v. Bayou Vista Manor, 371 So.2d 1146, 1150 (La.1979).
[5] Bruno, 593 So.2d at 361; Smith v. Grand Isle Shipyard, 95-0259, p. 3 (La.App. 1st Cir. 10/6/95), 671 So.2d 415, 416, writ denied, 95-2709 (La.1/26/96), 667 So.2d 524.
[6] Coats v. American Tel. & Tel. Co., 95-2670, pp. 4-5 (La.10/25/96), 681 So.2d 1243, 1245; Smith, 95-0259 at p. 3, 671 So.2d at 416.
[7] Bruno, 593 So.2d at 361.
[8] Bruno, 593 So.2d at 361; Bazar v. Hull, 95-1427, p. 2 (La.App. 1st Cir. 2/23/96), 669 So.2d 603, 604.
[9] See Housley v. Cerise, 579 So.2d 973, 976 (La. 1991); Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990).
[10] La. R.S. 23:1201 (F).
[11] La. R.S. 23:1201(F)(2).
[12] Gordon v. Sandersons Farms, 96-1587, p. 10 (La.App. 1st Cir. 5/9/97), 693 So.2d 1279, 1286-87; Ceasar v. Crispy Cajun Restaurant, 94-30, p. 8 (La.App. 3d Cir. 10/5/94), 643 So.2d 471, 477, writ denied, 94-2736 (La.1/6/95), 648 So.2d 931.
[13] Nelson v. Roadway Express, 588 So.2d 350, 355 (La.1991).
[14] An employee who finishes a day's work without reporting an accident is not barred from recovering compensation on that basis alone. Nelson, 588 So.2d at 353; Gordon, 96-1587, p. 7, 693 So.2d at 1284-85. Furthermore, the hearing officer found credible plaintiff's explanation for not reporting the accident immediately. She stated in written reasons that some mental deficiency was obvious from his appearance and communication, as well as from his employment application, whereon he indicated he is disabled and handicapped.